IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

LISA BRUNSON,                                )
                                             )
        Plaintiff/Counter-Defendant,         )
                                             )        NO. 3:20-cv-01056
v.                                           )        JUDGE RICHARDSON
                                             )
DAVID COOK d/b/a INTEGRITY                   )
MUSIC, CAPITOL CMG, INC. et al.,             )
                                             )
        Defendants/Counter-Plaintiffs.       )

## MEMORANDUM OPINION

Pending before the Court is Defendant Capitol CMG, Inc.'s and David C. Cook d/b/a Integrity Music's (collectively, "Defendants")[1] joint motion, supported by an accompanying memorandum, for issuance of a request to the register of Copyrights under 17 U.S.C. § 411(b)(1).[2] (Doc. Nos. 114 (the "Motion"), 115). The Motion alleges that Plaintiff included inaccurate information on the application for the copyright registration with registration PAU004024415. (Doc. No. 114). Plaintiff filed a response (Doc. No. 134), and Defendants filed a reply (Doc. No. 144). Also pending before the Court are the parties' respective cross-motions for summary judgment (Doc. Nos. 111, 118). Defendants also filed a supplemental memorandum of law in

---

[1] The Court notes that Osinachi Kalu Okoro Egbu is a Defendant in this action but is not a movant as to the present Motion. Defendant Egbu is, however, a movant with respect to the pending motion for summary judgment at Doc. No. 118, along with Defendants Capitol CMG, Inc. and David C. Cook d/b/a Integrity Music.

[2] As discussed below, the "request" here at issue is a request, pursuant to 17 U.S.C. § 411(b)(1), that the Register of Copyrights advise the requesting court whether the inaccuracy of specified information in an application for a copyright, had the inaccuracy been known by the Register of Copyrights, would have caused the Register of Copyrights to refuse registration of a particular copyright (relevant to the litigation) that had been registered. At times herein, such a request will be called a "request to the Register" for short.

support of the Motion to further address arguments made in the Motion that may have been affected by the Court's order (Doc. No. 147) on Plaintiff's partial motion to dismiss and strike. (Doc. No. 164-1).

For the reasons stated herein, the Motion at Doc. No. 114 is granted in part and denied in part, in that the Court will request a response from the Register regarding some but not all matters as to which Defendants seek a request . Though the Court will not be bound by the response of the Register to the request ordered herein,[3] the Court finds that because the response of the Register has the potential to materially affect the parties' arguments and the Court's analysis with respect to the motions at Doc. Nos. 111 and 118, those motions are denied without prejudice, subject to refiling to the extent appropriate after the Court's receipt of the response from the Register. An accompanying order shall be entered separately.

## FACTUAL BACKGROUND[4]

The Court's memorandum opinion on Plaintiff's partial motion to dismiss and to strike (Doc. No. 146) sets forth in detail the relevant background facts of this case, and the Court need not repeat itself here in full for the purposes of resolving the present Motion. The Court includes the following facts to provide context for the resolution of the present Motion.

Plaintiff Lisa Brunson is a congregational worship leader, music director, and singer/songwriter. (Doc. No. 146 at 1). Defendants CCMG and David C. Cook d/b/a Integrity Music (hereinafter "Integrity Music") (collectively, "the Publishers") are music publishers and

---

[3] *See Palmer/Kane v. Gareth Stevens Publishing*, 1-15-cv-7404, 2016 WL 6238612, at *1 (S.D.N.Y. Oct. 24, 2016) ("[T]he response provided by the Register is not binding on the Court.").

[4] Unless indicated otherwise, the various facts contained in the following section are treated herein as true either because they are undisputed or because they are sufficiently supported by the factual record to be treated as true for purposes of resolving the present Motion.

music publishing administrators who own music copyrights in many popular worship and Christian musical compositions. (*Id.* at 1). Defendant Integrity Music purportedly administered the copyright to a song titled Way Maker, first written and sung by artist Osinachi Kalu Okoro Egbu ("Sinach"). (*Id.* at 2). CCMG contends that from July 1, 2011 to July 1, 2021, it exclusively administered Integrity Music's interest in Way Maker pursuant to a written administration agreement between the two entities. (*Id.*).

Plaintiff is the alleged author of the work registered with the United States Copyright Office with the registration PAU004024415 (*i.e.* hereinafter "Plaintiff's work"). (*Id.* at 2). The crux of this litigation as a whole is that Plaintiff's work is a musical bridge that was written primarily to be performed as part of the song Way Maker—*i.e.*, primarily to replace, in a particular place in the song Way Maker, what had been in that place as Way Maker was originally written. Though Plaintiff's work has its own copyright registration, Way Maker, which was written by Sinach, also has its own copyright registration.

Defendants now claim that Plaintiff knowingly included inaccurate information in the application for the copyright registration for the work with registration PAU004024415.

On May 8, 2020, Plaintiff, acting through Adam Carpenter, an employee of her then-music publisher, first applied for copyright registration of Plaintiff's work. (Doc. No. 116-7 at 22). In doing so, she applied on the basis that Plaintiff's work was previously published, indicating that the date of prior publication was June 5, 2017. (*Id.* at 20).

On May 11, 2020, the Copyright Office contacted Carpenter about an "issue with the application." (*Id.* at 9). In the message, a representative of the Copyright Office explained that the "files uploaded for 'You Never Stop Working' [*i.e.* Plaintiff's work] contain only part of the work starting at measure 56. The entire work as it was first published must be uploaded with the

application before I can proceed with examining your claim." (*Id.*). Defendants allege that, as reflected in the message from the Copyright Office, Plaintiff submitted with her application a deposit copy[5] of Plaintiff's work that was an excerpt of Way Maker and which showed that Plaintiff's work began at measure 56 of Way Maker. (Doc. No. 115 at 12–13).

After attempting to rectify the issue, the Copyright Office remained confused as to whether it had been made aware of the complete work for which Plaintiff sought registration. Indeed, the Copyright Office wrote Carpenter again, this time saying that "you uploaded the same audio file, and [] the sheet music you uploaded is identical to the first copy, except for the measure numbers. It is unclear if these materials represent the full published work. Additionally, we need you to confirm if Lisa Marie Ireland-Brunson is the sole author of the entire song, or if there are additional authors of the entire work." (Doc. No. 116-7 at 13).

The following day, the Copyright Office contacted Carpenter yet again, this time inquiring as to the publication status of Plaintiff's work. (*Id.* at 14). The Copyright Office wrote to Carpenter, "Can you please explain how this work (and specifically how this version) was published? A preliminary internet search of this work shows multiple published versions and live recordings that appear to be more complete." (*Id.*). The message then contained a definition of "publication" from the Compendium.[6] Carpenter then responded, stating that there had been some confusion and that his attorney would be reaching out on his behalf. (*Id.* at 15). Plaintiff's attorney, David Engelhardt, then wrote to the Copyright Office, stating that Plaintiff's work was not previously published and that they would proceed with the application on the basis that the work was unpublished. (*Id.* at

---

[5] When applying for a copyright registration, the application must include a copy (or copies) of the work for which registration is sought. 17 U.S.C. § 408(b). Such a copy is known as a deposit copy.

[6] As discussed in detail below, the Compendium is a publication from the Copyright Office that assists those who issue copyrights to interpret copyright law and make decisions on whether to issue a copyright.

16; Doc. No. 116-13 at 6–7 (Engl. Dep.)). The application was then approved. (Doc. No. 116-7 at 18).

In the present Motion, Defendants allege that Plaintiff knowingly included inaccurate information on the copyright application for Plaintiff's work when (as according to Defendants) she misrepresented Plaintiff's work as complete and indicated that the work was unpublished.

PROCEDURAL BACKROUND

On April 29, 2022, Defendants filed a motion (Doc. No. 101) requesting the Court issue a request to the Register of Copyright. In the motion, Defendants alleged that Plaintiff knowingly included inaccurate information on the application for the copyright registration for Plaintiff's work (*i.e.* the application that ultimately resulted in registration PAU004024415). (*Id.*). On May 19, 2022, the parties participated in a telephone conference with Magistrate Judge Newbern, after which Judge Newbern directed the clerk's office to terminate the motion that was pending at Doc. No. 101 subject to refiling following the conclusion of the parties' expert witness discovery. (Doc. No. 107). On June 24, 2022, following the conclusion of all discovery, Defendants re-filed their motion requesting the Court issue a request to the Register with the same allegations regarding inaccuracies contained in the copyright application. (Doc. No. 114).

DISCUSSION

## 1. REQUEST TO REGISTER OF COPYRIGHTS UPON ALLEGATIONS

"To establish [copyright] infringement, two elements must be proven: (1) ownership [by the plaintiff(s)] of a valid copyright, and (2) copying [by the defendant(s)] of constituent elements of the work that are original." *See Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 361 (1991). "With certain exceptions that are not relevant here, however, a certificate of copyright registration *is* a prerequisite to bringing a civil copyright infringement

claim action," which Plaintiff has done in this case. *See Palmer/Kane v. Gareth Stevens Publishing*, 1-15-cv-7404, 2016 WL 6238612, at *1 (S.D.N.Y. Oct. 24, 2016). "[A] certificate of registration satisfies this prerequisite [of a valid certification of copyright registration] 'regardless of whether the certificate contains any inaccurate information,'" *see id.*, unless "(A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration" *see* 17 U.S.C. § 411(b)(1).

"In any case in which inaccurate information described under paragraph (1) is alleged, the court shall request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration."[7] *See* 17 U.S.C. § 411(b)(3). "In other words, before finding that knowingly inaccurate information would have caused the Register of Copyrights to refuse registration, a court must ask the Register whether that would have been the case." *See Palmer/Kane*, 2016 WL 6238612, at *1.

Although the statute by its terms states that mere allegations as to the inaccuracy of information are sufficient under § 411(b) to trigger the court's obligation to make a request, courts and the Register have parted from the plain language of the statute on this point. As the Seventh Circuit observed in *DeliverMed Holdings, LLC v. Schaltenbrand*, the ability to obtain a request of the Register on allegations alone leaves § 411 susceptible to abuse by opportunistic litigants and, therefore "courts and litigants [should be] wary of using this device in the future." 734 F.3d 616, 625 (7th Cir. 2013). To avoid the risk of § 411 being used as a "delay tactic" *see id.*, courts and the Register "generally agree that [courts] may first require the party seeking invalidation to

---

[7] As discussed further below, there remains an unresolved question among the courts to whether a party requesting issuance to the Register of Copyrights under § 411 must allege that the "inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration."

establish as a factual matter that the applicant included inaccurate information on the registration application with knowledge that it was inaccurate" *Palmer/Kane*, 2016 WL 6238612, at \*2.

Though the Sixth Circuit has not commented on whether mere allegations are sufficient under § 411(b) to require a request to the Register, this Court has agreed with other courts and the Register that courts may require a party seeking invalidation to establish the requirements of § 411(b) as a factual matter rather than issue a request to the Register based solely on the party's allegations. *See Schenck v. Orosz*, 105 F. Supp. 3d 812, 818 (M.D. Tenn. 2015). Therefore, the Court will evaluate Defendants' request in light of the factual record and will not act merely on the allegations as stated in their Motion.[8]

## 2. INACCURATE INFORMATION

Defendants argue that Plaintiff included two types of inaccurate information on the application for copyright. First, Defendants argue that Plaintiff improperly represented Plaintiff's work as unpublished when it had in fact been published on several occasions. (Doc. No. 115 at 18). Second, Defendants argue that Plaintiff represented to the Register that her work was a complete work when in fact it was "so obviously derivative and dependent upon" Way Maker. (*Id.* at 22). The Court addresses each argument in turn below.

### A. Whether Plaintiff's Work was Published at the Time Plaintiff Applied for the Copyright in Question

Defendants argue that Plaintiff's work was published at the time Plaintiff submitted her application to the Copyright Office for the copyright in question, and that therefore the application

---

[8] Although courts appear to address requests by litigants to issue questions to the Register fairly frequently, it appears that none have decided what evidentiary basis—what kind(s) or quantum of evidence—is required for such issuance. Given that the plain text of the statute permits a request on the basis of allegations alone, presumably the evidentiary requirements should not be very demanding. It appears to the Court that if the record reflects some basis to find each required element under § 411, then there is sufficient evidence to support a request to the register.

was inaccurate in representing that Plaintiff's work was unpublished. (Doc. No. 115 at 18). The parties do not dispute that Plaintiff represented Plaintiff's work as unpublished in applying for the copyright registration. (Doc. Nos. 115 at 14, 134 at 2). Defendants contend that such representation was false; identifying several instances in which Plaintiff's work was made available to the public prior to the application for the copyright registration, Defendants argue that these constitute publication under the Copyright Act.

Specifically, Defendants contend that the following constitute publication under the Copyright Act: 1) Plaintiff's alleged direction to distribute Plaintiff's work to the "Seriously?!" web series; 2) the alleged "distribution" of a World Harvest Church ("WHC") pastor's service recorded and distributed via "Rod Parsley TV." The service was available for streaming via the Rod Parsley TV website and was "available through an [sic] smartphone app with a 'download' button."; 3) Plaintiff's alleged authorization of a YouTube[9] video of her performance of Plaintiff's

---

[9] "YouTube hosts user-generated videos and related content on its eponymous platform. YouTube is the world's largest forum in which the public may post and watch video based content. Around 400 hours of video content are uploaded to the platform hourly. Indeed, more video content has been uploaded to YouTube than has been created by the major U.S. television networks in 30 years. [M]ore than 500 million hours" of those videos are watched each day." *See Prager University v. Google LLC*, 951 F.3d 991, 996 (9th Cir. 2020) (alteration original).

work at WHC 2017 Dominion camp Meeting and subsequent authorization to create a shortened version of the video to be shared to Twitter[10] and Instagram.[11] (Doc. No. 115 at 20–22).

The Court must now determine whether the availability of Plaintiff's work on the Internet through the above-mentioned channels rendered it published within the meaning of the Copyright Act.

### i. Publication under the Copyright Act

"Although it does not define 'published,' the Copyright Act defines 'publication' as 'the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending.'"[12] *See Rogers v. Betters Business Bureau of Metropolitan Houston Inc.*, 887 F. Supp. 2d 722, 730 (S.D. Tex. 2012) (quoting 17 U.S.C. § 101). The definition goes onto explain that: "The offering to distribute copies or phonorecords to a group

---

[10] "Twitter is an online social media platform where users are able to publish short messages, to republish or respond to others'' messages, and to interact with other Twitter users in relation to those messages. [] The social media site has over 300 million users worldwide. There are approximately 70 million Twitter users in the United States." *See One Wisconsin Now. v. Kremer*, 354 F. Supp. 3d 940, 943 (W.D. Wisc. 2019) (internal quotation marks omitted). "All of a user's own tweets are displayed on the user's timeline. A user's most recent tweets are automatically published on the top of her timeline. A user can also display content from other Twitter users on her timeline by retweeting or quoting another user. If a user retweets another user, the other user's original tweet will appear on the retweeter's timeline along with the user's own tweets." *See id.* at 944.

[11] "Instagram is a web-based photo and video sharing social media platform through which users host and share user-generated content. Instagram provides an application for mobile devices that allows users to upload photos, apply digital filters to those photos, and share them with others on Instagram and other social networking websites like Twitter and Facebook." *See Backgrid USA, Inc. v. Enttech Media Group LLC*, CV 20-6803, 2020 WL 6888724, at *1 n.1 (C.D. Cal. Aug. 21, 2020) (internal quotation marks omitted). "Over 100 million users subscribe to Instagram's service." *See Rodriguez v. Instagram, LLC*, No. C 12-06482, 2013 WL 3732883, at *1 (N.D. Cal. Jul. 15, 2013). "[Each] Instagram user is advised that "[a]ll photos are public by default which means they are visible to anyone using Instagram or on theinstagram.com website." *See Binion v. O'Neal*, No. 14-13454, 2015 WL 3544518, at *1 (E.D. Mich. Apr. 2, 2015).

[12] In referring to a work as "published" under the Copyright Act, courts are relying on the definition of "publication" contained in 17 U.S.C. § 411. The Court does the same herein. Therefore, insofar as the Court discusses works being "published" within the meaning of the Copyright Act, the Court intends for the term to carry the same meaning as the definition of "publication" within the meaning of the Copyright Act. That is, a "published" work is a "publication" within the meaning of the Copyright Act.

of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication." *See* 17 U.S.C. § 101.

As several courts have pointed out, the Copyright Act was enacted prior to the invention and proliferation of the Internet. As one court recently explained:

> The Copyright Act of 1976, enacted prior to the internet, struggles to address the nuances and novelty that can arise at the intersection of copyright law and technology. The fast-paced nature of modern technology makes it exceedingly difficult for courts to find proper solutions to unique legal issues while still appropriately applying the statute. The question facing the Court now is one of many examples of the ongoing challenges facing courts and litigants.

*See FurnitureDealer.Net, Inc. v. Amazon.com, Inc.*, Civ. No. 18-232, 2022 WL 891473, at *8 (D. Minn. Mar. 25, 2022). Therefore, courts have been left to determine what "publication" means in the context of the Internet—an invention that has revolutionized the way society produces, experiences, and shares information that is often subject to U.S. copyright laws.

The United States Copyright Office periodically publishes the Compendium of U.S. Copyright Office Practices ("Compendium"). *States Copyright Office*, 3d Ed. (Jan. 2021) (https://www.copyright.gov/comp3/docs/compendium.pdf) ("Compendium") (last visited March 2, 2023). "[T]he Compendium 'is the administrative manual of the Register of Copyrights concerning the Copyright Act and regulations promulgated thereunder.'" *See Lieb v. Korangy Publishing Inc.*, CV 15-0040, 2022 WL 1124850, at *9 (E.D.N.Y. Apr. 14, 2022) (quoting Compendium). "It 'provides instruction to agency staff regarding their statutory duties and provides expert guidance to copyright applicants, practitioners, scholars, the courts, and members of the general public regarding institutional practices and related principles of law.'" *See id.* "While the Compendium is intended as a guide to the USCO staff and the public, it has also been cited and relied upon by Courts deciding copyright cases." *Id.* Although the Sixth Circuit has not directly

addressed the degree of deference afforded to the opinions of the Copyright Office, the Court agrees with several other courts in finding that deference under *Skidmore v. Swift* is appropriate with regard to the views of the Copyright Office expressed in the Compendium.[13] *See Media.net Advertising FZ-LLC v. NetSeer, Inc.*, 156 F. Supp. 3d 1052, 1061 (N.D. Cal. 2016) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (2001)). "Under *Skidmore*, the degree to which a court defers to an agency's opinion or interpretation 'will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *See id.* (quoting *Skidmore*, 323 U.S. at 140).

Further, unlike the Copyright Act, which did not contemplate the meaning of "publication" in the context of the Internet, the Compendium discusses how to apply the Act's definition of "publication" to works made available via the Internet. Both parties rely on the explanations of the Copyright Office regarding the meaning of "publication" contained in the Compendium in their briefing on Defendants' Motion. Therefore, in resolution of the pending Motion, the Court relies on the Compendium to the extent that it is persuasive.

Though the Court has more to say below about what "publication" means under the Copyright Act with respect to works made available on the Internet, it is sufficient at this juncture to say that the explanations contained in the Copyright Act have inherent limitations in their application to cases that implicate such works. The Copyright Office, through the Compendium, has attempted to construe the Copyright Act in light of technological developments, and the Court defers to the Compendium to the extent required under *Skidmore*.

---

[13] That is not to suggest that the Court in any way cedes to the Copyright Office the Court's proper role in construing statutory terms.

Defendants argue that Plaintiff's work was published when it was "apparently distributed to the public by way of the 'Seriously?!' web series . . . ." (Doc. No. 115 at 20). Defendants assert that the "evidence demonstrates" that Plaintiff's work was "distributed to a group of WHC-affiliated broadcasters . . . as well as to broadcasters *unaffiliated* with WHC. . .." (*Id.*). The record includes two documents indicating that the "Seriously?!" web series appears to be an online show that is available on the Valor Christian College webpage (Doc. No. 116-15 at 2) and YouTube (Doc. No. 116-16 at 2). The record also includes an email chain that includes an email from Plaintiff in which she states, "Do you know when we will have the video to Waymaker from DCM to post on HML [Harvest Music Live]? It's the song that I think is airing on Seriously this weekend. . . ." (Doc. No. 116-6 at 3).

Plaintiff argues that based on the documents on the record, Defendants are merely speculating as to whether Plaintiff's work aired on "Seriously?!" (Doc. No. 134 at 21). And indeed, the images provided by Defendants at Doc. Nos. 116-15 and 116-16 do not reflect that Plaintiff's work was aired during the web series. The email from Brunson also does not definitively establish that it aired during the series. Therefore, the Court agrees that the factual record as to whether Plaintiff's work aired during the "Seriously?!" web series is insufficient to establish that it in fact aired. The Court therefore finds that Plaintiff's work was not published with respect to the "Seriously?!" web series.

iii.    *Downloadable Church Service*

Defendants argue that Plaintiff's work was published when it was streamed and subsequently made available for download via the Rod Parsley TV webpage and app as part of a church service led by pastor Rod Parsley. (Doc. No. 115 at 21). A review of the caselaw reflects

that courts generally find publication to have occurred when a work is made available on the Internet and the end user is able to download the work. *See Getaped.Com, Inc. v. Cangemi*, 188 F. Supp. 2d 398, 401 (S.D.N.Y. 2002) ("The common theme running through these decisions [*i.e.* decision on whether a work was published under the Copyright Act when it was made available on the Internet] is the ability of the Internet user to download a file containing a copyrighted work and thereby gain control of it, that is, gain a proprietary or possessory interest in the copyrighted work.").

For example, in *Kernal Records Oy v. Mosley*, the court was confronted with the question of whether posting a musical composition and musical arrangement on a website, where the composition and arrangement was "also available for download and copying" constituted "publication" under the Copyright Act. 794 F. Supp. 2d 1355, 1364 (S.D. Fla. 2011). The court agreed with the observation made in *Getaped.Com*, that in assessing a potential internet publication, a determinative factor is whether the public can download the file. *See id.* The court explained that "from the moment it was posted online, [the composition and arrangement] could be reproduced, distributed, or otherwise manipulated." *See id.* In the court's view, the members of the public had, at least in theory, the ability to acquire a possessory interest in the composition and arrangement via downloading the work. *See id.* The court therefore found that the work had been published under the Copyright Act.

*Kernal* is instructive here. Defendants have identified facts on the record to support the finding that the service posted to the Rod Parsley TV webpage and app that contained Plaintiff's work was downloadable. (Doc. No. 115 at 21). Defendants have submitted two images on the record. One image shows that an on-demand church service was provided on November 8, 2017 at 7 P.M via Rod Parsley TV. (Doc. No. 116-11 at 2). Plaintiff does not dispute that she performed

Plaintiff's work during this church service. (Doc. No. 134 at 22). Defendants also provide an image of a church service scheduled for May 11, 2022 from what appears to be the same platform on which the November 8, 2017 church service was advertised—the image shows that the "linked file" for the May 11, 2022 church service is available for download. (Doc. No. 116-12 at 2).

Plaintiff correctly points out that the image that is accompanied by the download button is *not* the service from November 8, 2017. (Doc. No. 134 at 21–22). However, the Court assumes that the reason for the discrepancy is that the November 8, 2017 service occurred over four years ago and therefore it may not be available to demonstrate that it is currently downloadable. Therefore, Defendants chose a more recent service as a stand-in to illustrate that the services posted to this platform are generally downloadable.[14]

Plaintiff contends that there is no proof that the "download function was created with [her] permission." (*Id.* at 23). The Compendium explains that "[a] distribution or offer to distribute that has not been authorized by the copyright owner does not constitute publication." *See* Compendium, § 1008.3(C). The Compendium further explains that authorization can be either explicit or implicit. *See id.* The Compendium provides a list of factors to consider in determining whether a copyright owner published website content by "impliedly authorizing" users to make copies (in this case via downloading) of the content. *See id.* § 1008.3(D).

---

[14] The Court acknowledges that the images provided by Defendants do not definitively evidence that a video of the November 8, 2017, church service was made available for download. However, the images do show that a video of the November 8, 2017 service was made available on a platform that appears to generally allow media to be downloaded, and that the download feature was available at least as of the date that Defendants captured the image at Doc. No. 116-12. Because the November 8, 2017 church service is available on this platform, the Court finds it reasonable to draw (albeit not with certainty) the inference that a video of the service was made available for download prior to the time that Plaintiff submitted her application to the Copyright Office.

After reviewing the list, the Court is satisfied that the factual record supports that Plaintiff implicitly authorized users to download Plaintiff's work via the webpage and app to which the work was posted. Indeed, the work is available on a platform that provides a "download" button. And there is no indication that Plaintiff "expressly reserved a copyright in the work or explicitly prohibited the reproduction or distribution of the work in whole or in part"; nor is there an indication that Plaintiff "employed barriers to the reproduction or distribution of the work, such as technological measures that disable or impair a web browser's print, copy, and/or save capabilities."[15] *See id.* Importantly, Plaintiff chose to perform Plaintiff's work during the service, which was advertised as live-streamed and appears to be downloadable. And it is hardly far-fetched to believe that a performer would have been aware of the downloadable nature of the video of the service.

Therefore, the Court finds that based on the factual record, Plaintiff's work was published within the meaning of the Copyright Act when it was posted to Rod Parsley TV and made available for download.

### iv.    *YouTube, Instagram, and Twitter*

Given that the Court has found that Plaintiff's work was published when it was made available for download as part of the November 8, 2017, church service as discussed above, the Court could turn to the remainder of the analysis without addressing whether Plaintiff's work being made available on YouTube, Instagram, and Twitter also constitutes "publication" under the Copyright Act. However, the parties devote significant attention to the question of whether the availability of Plaintiff's work on YouTube, Instagram, and Twitter (Doc. Nos. 116-2 (Twitter),

---

[15] The Compendium lists the *existence* of these circumstances—the two circumstances placed in quotation marks in the sentence to which this footnote is appended—as "relevant" in determining whether a copyright owner published content on online. From this, the Court infers without much difficulty that the *absence* of such circumstances would weigh against finding that a copyright owner published the work online.

116-5 (YouTube), 116-8 (Instagram) 116-9 (Instagram)) constitute "publication." The Court therefore finds it prudent to address, alternatively, whether Plaintiff published her work when she made it available on these platforms.

Defendants contend that Plaintiff's work was posted to WHC's YouTube page at Plaintiff's direction. (Doc. No. 115 at 20). In support of this contention, Defendants provide a snapshot of WHC's YouTube page with a video titled "Way Maker at Dominion Camp Meeting 2017 – Harvest Music Live," (Doc. No. 116-5) (which included Plaintiff's work) and an email from Plaintiff requesting that Way Maker be posted on YouTube (Doc. No. 116-6). Defendants then point to an email from Plaintiff in which she writes, "Can you also do a 60 second that includes the chorus and then the 'even when I don't feel it you're working' part?" (Doc. No. 121-6 at 2). Defendants assert that this question was in substance a request to alter the full-length performance that was posted to YouTube, such that it would be an appropriate length to be posted to Twitter and Instagram. (Doc. No. 115 at 11). Defendants have submitted snapshots of the Twitter post (*i.e.* "Tweet") and Instagram posts that purportedly include the abbreviated video. (Doc. Nos. 116-2, 116-8, 116-9).

As explained above, the Copyright Act was written before the advent of the Internet, and therefore Congress evidently did not have in mind the manner in which information, including media such as video, is now experienced via the Internet when writing the definition of "publication" contained in the Act. The Compendium, on the other hand, provides guidance and commentary on when a work made available on the Internet constitutes a "publication" or is "published" within the meaning of the Copyright Act. *See* Compendium, § 1008.3(B). Regarding works available online, the Compendium describes two sets of circumstances when a work generally will, and one set when a work generally will not, constitute a "publication":

[1] As a general rule, the U.S. Copyright Office considers a work "published" when it is made available online if the copyright owner authorizes the end user to retain copies or phonorecords of that work.

. . .

[2] Likewise, the Office generally considers a work "published" when the copyright owner makes copies or phonorecords available online and offers to distribute them to a group of persons for purposes of further distribution, public performance, or public display.

. . .

[3] As a general rule, the Office does not consider a work to be published if it is merely displayed or performed online, unless the author or copyright owner clearly authorized the reproduction or distribution of that work, or clearly offered to distribute the work to a group of intermediaries for purposes of further distribution, public performance, or public display.

*See id.* The Compendium further acknowledges that it is "odd that allowing the whole world to view or hear a work does not [necessarily] constitute publication of a work, but the statutory definition is clear that the public performance or public display of a work does not, in and of itself, constitute publication." *See id.*

Defendants argue that the YouTube video, Twitter, and Instagram posts constitute publications under the third circumstance provided in the Compendium (listed above) because the videos depict Plaintiff's work "displayed or performed online," and Plaintiff "clearly offered to distribute the work [via the videos] to a group of intermediaries for purposes of further distribution, public performance, or public display." (Doc. No. 115 at 19 (citing Compendium, § 1008.3(B)). Plaintiff argues that the third circumstance provided by the Compendium does not apply in this case because Plaintiff's work was not distributed to a "group of intermediaries" and the work was

not "distributed" within the meaning of the Copyright Act.[16] The Court addresses each argument in turn directly below.

### a. Group of Intermediaries

Plaintiff argues that the circumstance does not encompass Plaintiff's work as it was made available on YouTube, Instagram, or Twitter, because the circumstance requires distribution to a "group of intermediaries" and the alleged distribution with respect to these examples was to WHC—a single entity and Plaintiff's employer. (Doc. No. 134 at 19–20). In their reply, Defendants argue that Plaintiff distributed Plaintiff's work not to a single entity, but rather to several intermediaries, including "Seriously?!," Rod Parsley TV, and WHC. (Doc. No. 144 at 4).

At the outset, the Court notes that the Compendium appears to use the phrase "group of persons" (as it appears in the Copyright Act) and "group of intermediaries" (as it appears in the Compendium) interchangeably. *See* Compendium, § 1906.1 Therefore, for present purposes, the Court does the same.

The Court agrees that Plaintiff distributed Plaintiff's work to Rod Parsley TV and to WHC, which together constitute a "group of persons" under the Copyright Act.[17] Although the courts have written very little on what it means under the Copyright Act for a work to be distributed to a "group of persons," at least one court has surmised that distribution to a *single* person is likely

---

[16] Plaintiff accuses Defendants of cherry-picking a circumstance from the Compendium to support their position. (Doc. No. 134 at 19). However, the Compendium, as plainly illustrated above, gives readers an assortment of circumstances to assess whether a work made available online constitutes a "publication" under the Copyright Act. So there is nothing untoward about Defendants choosing to focus on any particular circumstance they assert supports their position.

[17] As explained above, the Court has already found that Plaintiff did not publish Plaintiff's work to the "Seriously?!" web series.

insufficient. *See Palmer/Kane*, 1-15-cv-7404, 2017 WL 3973957, at *11, n.8 (S.D.N.Y. Sept. 7, 2017). The Compendium states:

> Section 101 of the Copyright Act states that "offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display constitutes publication." 17 U.S.C. § 101. Specifically, publication occurs when one or more copies or phonorecords are offered to wholesalers, retailers, broadcasters, aggregators, or similar intermediaries for the purpose of distributing the work to the public or for the purpose of publicly performing or publicly displaying the work.

*See* Compendium, § 1906.1. The Compendium provides several examples of when a work is distributed to a group of persons, including when "a sound recording has been offered for distribution to multiple online streaming or download services . . .." *See* Compendium, § 1008.3(B). In determining whether distribution has occurred, the relevant question is not whether the exact performance or recording was distributed to a "group of persons" or "group of intermediaries," but whether the *work* was so distributed. Thus, although the video that was provided to WHC was not the same video provided to Rod Parsley TV, Plaintiff's work was distributed to Rod Parsley TV where it was performed during a church service and to WHC, which then posted it to its YouTube channel, Harvest Music Live.[18]

Plaintiff further argues that "group of persons" cannot refer to her own employer (WHC). (Doc. No. 134 at 9–10). Plaintiff offers no support for this contention. As far as Plaintiff alleges in her Complaint (Doc. No. 1), WHC has no rights over the copyright for Plaintiff's work merely by virtue of being Plaintiff's employer, which would appear to the Court as the relevant fact in

---

[18] The Court notes that the Copyright Act, the Compendium, and the caselaw are devoid of discussion of how many broadcasters, aggregators, retailers, etc. are sufficient to constitute a "group" within the meaning of the Copyright Act. Even if the Copyright Act had provided a number, the Court wonders how such a number could be applied in this context, given that the Act was written before the Internet and considering how the Internet has allowed technology to reach audiences on such a mass scale. It is sufficient for present purposes that the Court is satisfied that two is sufficient to constitute a "group of persons" under the Copyright Act.

determining whether an entity falls within the scope of a "group of intermediaries" or "group of persons." Therefore, the Court finds that WHC falls into the "group of persons" or "group of intermediaries" relevant within the meaning of the Copyright Act despite its status as Plaintiff's employer.

The Court thus finds that when Plaintiff made her work available to WHC and Rod Parsley TV, she made it available to a "group of persons" or "group of intermediaries" within the meaning of the Copyright Act.

b. The Meaning of "Distribution"

Plaintiff next contends she did not "clearly offer[] to distribute the work to a group of intermediaries for purposes of further distribution, public performance, or public display" *see* Compendium, § 1008.3(B) because "distribution" means for end users to be able "retain copies,"[19] and YouTube, Instagram, and Twitter provide only "non-downloadable" copies to end users (Doc. No. 134 at 20). Several courts have considered the extent to which making a work available on the Internet constitutes publication under the Copyright Act. In Plaintiff's favor, as discussed above, many courts agree that where a work is downloadable, the work has been "published." *See FurnitureDealer.Net., Inc.*, 2022 WL 891473, at *8 (summarizing caselaw on publication under

---

[19] Plaintiff puts it this way: "the Compendium makes clear that 'reproduction or distribution' means to 'retain copies' (not streaming)." (Doc. No. 134 at 19). But the part of the Compendium Plaintiff quotes for this proposition, (Doc. No. 134 at 19 (quoting § 1008.3(B)) actually does not indicate that distribution (or, for that matter, reproduction) *means* "retain copies [of the work]" At best, it stands for the proposition that distribution of a work *occurs* if (though not necessarily only if) the *copyright owner authorizes the end user* to retain copies of that work. The Court construes Plaintiff's argument here in a manner more consistent (though not entirely consistent, as so doing would be to break Plaintiff's own words beyond the breaking point) with this proposition and with what the Court is confident Plaintiff means—*i.e.*, as an argument that "distribution" means to enable the end user to retain copies of that work.

the Copyright Act as identifying the distinguishing issue for publication as whether the end user could download the work).

Beyond instances in which a work is downloadable, at least one court has noted that the "current trend appears to favor finding works posted on the internet to be published," but that the "reasons for finding publication varies from case to case and is fact dependent." *See Rogers*, 887 F. Supp. 2d at 732. Further, at least a few courts have found that making work available on the Internet constitutes "publication" under the Copyright Act without regard to whether the work was made available for download. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1168 (9th Cir. 2007) (explaining that plaintiff's images were published when they were made available on the Internet for paid subscribers despite no download feature being available); *Erickson v. Blake*, 839 F. Supp. 2d 1132, 1134 (D. Or. 2012) (explaining that defendant "published a YouTube video" of a musical work); *Sleep Science Partners v. Lieberman*, No. 09-04200, 2010 WL 1881770, at *6 (N.D. Cal. May 10, 2010) (explaining that a website was "published" under the Copyright Act when it was made available on the Internet).

In *Getaped.Com, Inc.*, the court was called on to determine whether a webpage that was made available on the Internet was published within the meaning of the Copyright Act. *Getaped.Com, Inc.*, 188 F. Supp. 2d at 402. In *Getaped.Com*, the plaintiff had spent significant resources designing a webpage,[20] Getaped.com, which allowed visitors to the webpage to purchase certain motorized scooters. *See id.* at 399–400. The defendants allegedly copied the source code

---

[20] "A webpage consists of text interspersed with instructions written in Hypertext Markup Language ("HTML") that is stored in a computer. No images are stored on a webpage; rather, the HTML instructions on the webpage provide an electronic address at which the images are stored, whether in the webpage publisher's computer or some other computer. In general, webpages are publicly available and can be accessed by computers connected to the Internet through the use of a web browser." *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1155 (9th Cir. 2007).

of the webpage to make identical webpages, which purportedly infringed on plaintiff's copyright for a version of Getaped.com. *See id.* at 400. The court had to determine whether Getaped.com was published, rather than merely displayed, within the meaning of the Copyright Act when it was made available on the Internet. *See id.* at 401.

The court noted that then-existing caselaw had focused on the "ability of the Internet user to download a file containing a copyright work and thereby gain control of it . . . ." *See id.* With respect to webpages, however, the court explained that "[b]y accessing a webpage, the user not only views the page but can also view—and copy—the code used to create it." *See id.* at 402. "Consequently, when a website goes live, the creator loses the ability to control either duplication or further distribution of his or her work. A webpage in this respect is indistinguishable from photographs, music files or software posted on the web—all can be freely copied." *See id.* On this basis, the court found that Getaped.com had been published, or was a "publication," within the meaning of the Copyright Act. *See id.*

The reasoning of *Getaped.Com* is instructive here. The Court acknowledges that merely making a work available on YouTube, Instagram, and Twitter may not enable an end user to download a copy. However, as was true as to the webpage in *Getaped.Com* with respect being made available online, when a work is posted to platforms such as YouTube, Instagram, and Twitter, the "creator loses the ability to control either duplication or further distribution of his or her work." *See id.* at 402. Indeed, the fundamental purpose of social-media platforms such as Twitter and Instagram is for viewers to share and re-share content posted by creators[21] such as Plaintiff. As explained by one court with respect to Twitter, "[a] user can also display content from

---

[21] By "creator" or "creators" the Court means an individual or entity which posts content on YouTube, Instagram or Twitter.

other Twitter users on her timeline by retweeting or quoting another user. If a user retweets another user, the other user's original tweet will appear on the retweeter's timeline along with the user's own tweets." *See One Wisconsin Now*, 354 F. Supp. 3d at 943. Instagram has similar sharing capabilities. *See Binion*, 2015 WL 3544518, at *1 (explaining that once a user on Instagram has shared "User Content or made it public[,] that User Content may be re-shared by others" (internal quotation marks omitted)). Though YouTube may not provide its users the ability to re-share content on YouTube, YouTube does permit a user to share videos to several different social-media platforms by simply clicking the "share" button below a video.[22] (Doc. No. 116-5 at 3).

In this case, Plaintiff requested that Plaintiff's work be made available on YouTube, where the work could then be shared by a theoretically infinite number of individuals to a variety of different web-based platforms. (Doc. No. 121-6 at 4). She then requested that the video be altered into a shorter version to make it appropriate to be shared on Instagram and Twitter, where it again could be shared by a theoretically infinite number of users. (*Id.* at 2). And of course, the entire purpose of sharing a work to multiple platforms is to reach as wide an audience as possible.

Perhaps the most persuasive guidance that Plaintiff provides to support the notion that "distribution" means to enable the end user "to retain a copy" is a paragraph from the Compendium which states that "[a] mere display or performance is not a distribution, because the end user does not retain a 'copy' or 'phonorecord' of the work, as defined under the Copyright Act. *See* 17 U.S.C. § 101 (definition of 'copies' and 'phonorecords')."[23] *See* Compendium § 1008.3(B). Here, the

---

[22] The Court further notes that users who subscribe to YouTube's service "YouTube Premium," a paid subscription service, in fact *can* download YouTube videos. *See* YouTube Help, *Watch Videos Offline with YouTube Premium*, (https://bit.ly/3ZMh0MI) (last visited March 27, 2023).

[23] Plaintiff's additional arguments rely on the *other* circumstances that, according to the Compendium, indicate the occurrence of "publication." (Doc. No. 134 at 19). The Court, however, has found that the

Compendium suggests that a distribution occurs when an end user retains a copy or phonorecord. However, the Compendium's explanation falls short in the context of this case due to the Copyright Act's inherent limitation of being written pre-Internet. The definitions of "copies" and "phonorecords" in the Copyright Act do almost nothing to illuminate what retaining a copy means in the age of the Internet (inclusive of social media). *See* 17 U.S.C. § 101.[24]

The Court finds that a more applicable paragraph of the Compendium to this case is provided in § 1008.3(B), in which the Copyright Office explains that "the [Copyright] Office generally considers a work 'published' when the copyright owner makes copies or phonorecords available online and offers to distribute them for purposes of further distribution, public performance, or public display. For instance, *the fact that a sound recording has been offered for distribution to multiple online streaming or download services. . . creates a reasonable inference that an offer to distribute to a group of persons has been made and that publication has occurred*." *See* Compendium § 1008.3(B) (emphasis added). Plaintiff's view that a work is "distributed" online only when an end user can retain a downloadable copy is therefore not wholly supported by the Compendium. Indeed, the Compendium suggests that distribution occurs when a work is made available to *either* streaming or download services. And this interpretation of "distribution" is consistent with the Copyright Office's suggestion in its correspondence with Adam Carpenter that

---

Compendium provides several varying circumstances of when "publication" occurs from which to choose and apply.

[24] The Copyright Act defines "[c]opies" as "*material objects*, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device…." *See* 17 U.S.C. § 101 (emphasis added). It further denies "Phonorecords" as "*material objects* in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. . .." *See id.* The Act understandably does not address the issue of digital files, code, or data that is preserved in a server.

an "internet search" showed "multiple published versions and live recordings" of Plaintiff's work. (Doc. No. 116-7 at 14). The Court finds it reasonable to assume that the "internet search" to which the Copyright Office representative referred included results for Plaintiff's work on YouTube, Instagram, and Twitter.

That the end users who interfaced with Plaintiff's work on YouTube, Instagram, and Twitter, could not download the work appears inconsequential to the Court on the question of whether the work was published. The Court declines to agree with Plaintiff that "distribution" means to authorize the end user to "to retain copies" of Plaintiff's work. And even if the Court agreed that an end user had to have the ability to retain a copy for "distribution" to have occurred, the Court is not persuaded that "to retain copies" means "*only* to retain downloadable copies," as Plaintiff suggests. Instead, the Court finds that Plaintiff's work was published when it was made available on YouTube, Instagram, and Twitter, where it could be viewed and shared by the public.

Even if making a work available on YouTube, Instagram, and Twitter does not constitute "distribution" because the end user cannot retain a downloadable copy, the Court in the alternative finds that publication nonetheless occurs when a work is made available to YouTube, Instagram, and Twitter due to the terms of use or services to which a creator on these platforms must agree in order to post the work to the respective platforms. YouTube, Instagram, and Twitter have the following clauses in their terms of use or service respectively:

> "By providing Content to the Service, you grant to YouTube a worldwide, non-exclusive, royalty-free, sublicensable and transferable license to use that Content (including to reproduce, distribute, prepare derivative works, display and perform it) in connection with the Service and YouTube's (and its successors' and Affiliates') business, including for the purpose of promoting and redistributing part or all of the Service." YouTube, *Terms of Service*, (https://www.youtube.com/static?template=terms) (last visited March 9, 2023).

> "When you share, post, or upload content that is covered by intellectual property rights (like photos or videos) on or in connection with our Service, you hereby grant

to us a non-exclusive, royalty-free, transferable, sub-licensable, worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of your content (consistent with your privacy and application settings)." Instagram, Terms of Use, (https://help.instagram.com/581066165581870) (last visited March 9, 2023).

"By submitting, posting or displaying Content on or through the Services, you grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense) to use, copy, reproduce, process, adapt, modify, publish, transmit, display and distribute such Content in any and all media or distribution methods now known or later developed (for clarity, these rights include, for example, curating, transforming, and translating). This license authorizes us to make your Content available to the rest of the world and to let others do the same. You agree that this license includes the right for Twitter to provide, promote, and improve the Services and to make Content submitted to or through the Services available to other companies, organizations or individuals for the syndication, broadcast, distribution, Retweet, promotion or publication of such Content on other media and services, subject to our terms and conditions for such Content use. Such additional uses by Twitter, or other companies, organizations or individuals, is made with no compensation paid to you with respect to the Content that you submit, post, transmit or otherwise make available through the Services as the use of the Services by you is hereby agreed as being sufficient compensation for the Content and grant of rights herein." Twitter, *Twitter Terms of Service*, (https://twitter.com/en/tos) (last visited March 9, 2023).

The provisions contained in YouTube, Instagram, and Twitter's terms of use or service permit the platforms wide latitude to use the creator's content. For example, the Twitter terms of service permit Twitter to "copy, reproduce, process, adapt, [and] modify" content that is posted to Twitter. Twitter, *Twitter Terms of Service*, (https://twitter.com/en/tos) (last visited March 9, 2023). The Instagram and YouTube terms of use or service confer very similar rights upon Instagram and YouTube as to the content posted by creators on the respective platforms. It is therefore plain by the terms of use or service of these platforms that the *platforms* have the ability to make copies, coupled with extensive legal rights of use, even if the end user may not necessarily have access to a downloadable copy. The Court is therefore satisfied that when Plaintiff made Plaintiff's work available on YouTube, Instagram, and Twitter, she published her work within the meaning of the Copyright Act. Indeed, Plaintiff "clearly offered to distribute the work" to these respective

platforms for the "purposes of further distribution," and evidently these platforms were permitted to copy the work, along with being conferred a myriad of additional rights. *See* Compendium § 1008.3(B).

The Court acknowledges that the questions raised in the present Motion has required it to wade into an area of law that has caused much discussion, and at times, confusion, among courts over the last several decades. Though the Court is confident that it has arrived at the outcome that is consistent with existing caselaw and guidance contained in the Compendium, the Court acknowledges that the Register may feel it appropriate, in answering the questions potentially posed, to opine on whether Plaintiff's work was previously published. Given the limitations of the Copyright Act in providing guidance as to whether works made available on the Internet are published, the Court would welcome such input from the Register.

**B. Whether Plaintiff's Work Was a Complete Work at The Time of The Requested Copyright**

Defendants argue that Plaintiff included inaccurate information on the application for the copyright when she represented her work to the Copyright Office as a complete work when it in fact is a derivative work, *i.e.*, a work derivative of Way Maker. (Doc. No. 115 at 22). In support of this allegation, Defendants point out that on the deposit copy of Plaintiff's work submitted to the Copyright Office, Plaintiff included the measure notation of "56," despite Plaintiff's work consisting of only ten measures. (*Id.* at 12–13). The Copyright Office representative responded to Plaintiff's submission, apparently confused by the mismatch between the deposit copy containing the measure notation "56" and Plaintiff's work containing only ten measures, by requesting the entire work that Plaintiff sought to copyright. (*Id.* at 13). As pointed out by Defendants, Plaintiff then submitted a revised deposit copy to the Copyright Office with the measure notation "56" removed. (*Id.*). The Copyright Office remained unsatisfied with the revised version and responded

to Plaintiff's request by asking Plaintiff to clarify whether the work for which Plaintiff sought a copyright represented the complete work. (*Id.*).

While the Court admits that the series of events described immediately above raises some questions as to Plaintiff's conduct before the Copyright Office, the Court declines to issue Defendants' proposed request to the Register to advise the Court on whether knowledge of the fact that Plaintiff's work was not a complete work would have caused the Register to refuse registration. Implicit in Defendants' argument is that Plaintiff's work is derivative of Way Maker. If Plaintiff's work was *not* derivative, then Plaintiff did not conceal or misrepresent anything to the Copyright Office by indicating via the deposit copy that her work was complete. On the other hand, if the Court were to find that Plaintiff's work is derivative, then the Court could properly consider whether Plaintiff included inaccurate information on the application for her copyright. Defendants' Motion and accompanying memorandum, however, do not acknowledge that their argument is predicated on the notion that Plaintiff's work is derivative, and Defendants do not include an argument in their accompanying memorandum to the Motion—beyond the explanation as to the measure notation described above—as to why Plaintiff's work is in fact derivative of Way Maker. Although the Court acknowledges that Defendants provide extensive argument on this issue in their *summary judgment* briefing, the Court declines to rely on such argument in resolving the present Motion. If the issue of whether Plaintiff's work is derivative remains after the resolution of the issuance to the Register, the Court will have the opportunity to resolve the question at the summary judgment stage.

In summary, because the issue of whether Plaintiff's work is derivative is antecedent to the question of whether Plaintiff inaccurately represented Plaintiff's work as complete on the copyright application, and given that Defendants do not address the issue of whether Plaintiff's

work is derivative in their Motion, the Court declines to issue the request to the Register to advise the Court on whether knowledge that Plaintiff's work was complete would have caused the Register to refuse registration of Plaintiff's work.

### 3. KNOWLEDGE OF INACCURATE INFORMATION

As noted, a certificate under § 411(a) is valid unless "inaccurate information was included on the application for copyright *with knowledge* that it was inaccurate." *See* 17 U.S.C. § 411(b)(1)(A) (emphasis added). The Court must therefore next determine whether Plaintiff knew that Plaintiff's work was published at the time she represented the work as unpublished on the copyright registration application.

Plaintiff asserts that Defendants cannot establish Plaintiff's knowledge as required under § 411 due to the unsettled nature of the law regarding publication and the fact that the designation of Plaintiff's work was an innocent mistake insufficient to demonstrate intent to defraud. (Doc. No. 134 at 17). By contrast, Defendants argue that Plaintiff knew that her work was published at the time she applied to the Copyright Office for registration of Plaintiff's work as unpublished and therefore knew that the information contained on the application was inaccurate. (Doc. No. 115 at 23). Ultimately, both of Plaintiff's arguments are unavailing.

The Supreme Court recently addressed the requisite degree of knowledge required under § 411(b)(1)(A). *See Unicolors, Inc. v. H&M Hennes Mauritz L.P.*, 142 S. Ct. 941 (2022). The Court found that "knowledge" contained in this sub-subsection "means actual, subjective awareness of both the facts and the law." *See id.* at 947. Further, the Court rejected the notion that "Congress had intended to impose a scienter standard other than actual knowledge. . .." *See id.* As the Court explained, in "[t]he absence of similar language in the statutory provision before us tends to confirm our conclusion that Congress intended 'knowledge' here to bear its ordinary meaning."

*See id.* Though the Court found that an applicant under § 411 must have actual knowledge of both the facts and the relevant law for the knowledge requirement to be fulfilled under § 411, the Court explained that the courts may rely on "[c]ircumstantial evidence, including the significance of the legal error, the complexity of the relevant rule, the applicant's experience with copyright law, and other such matters, [that] may also lead a court to find that an applicant was actually aware of, or willfully blind to, legally inaccurate information." *See id.* 948.

Whether a work is published under the Copyright Act when it is made available on the Internet has been a popular topic of discussion and litigation by parties, the courts, and the Copyright Office for decades. As explained in *Unicolors*, "courts need not automatically accept a copyright holder's claim that it was unaware of the relevant legal requirements of copyright law." *See id.* at 948. And as noted in a central case on the issue from over ten years ago, "the current trend appears to favor finding works posted on the Internet to be published. . . ." *See Rogers*, 887 F. Supp. 2d at 732. True, there is some disagreement and certainly some gray area—as this Court has explored herein. However, for several years, the common thread of the caselaw, as reflected in the Compendium, has been that when (but not only when) a work is made available for download, it has been published within the meaning of the Copyright Act. Therefore, as to the Rod Parsley TV-service, there is no "law that is unsettled, conflicting, and confusing" that could have prevented Plaintiff from knowing whether Plaintiff's work was published. (Doc. No. 134 at 15–16).

Moreover, under *Unicolors*, the Court may consider "circumstantial evidence," which includes "the applicant's experience with copyright law . . . ." *See Unicolors*, 142 S. Ct. at 948. Plaintiff's attorney, David Engelhardt, who communicated with the Copyright Office on Plaintiff's behalf to apply for the copyright registration at issue in this case, testified in his deposition that he

specializes in "soft intellectual property," which includes copyrights. (Doc. No. 116-13 at 4). Engelhardt's deposition also reveals that he reviewed the definition of "publication" that was emailed by the Copyright Office and that he accessed the online version of the Compendium, which also contains information regarding works made available online. (*Id.* at 6–7). The Court is therefore satisfied that Plaintiff, through Engelhardt as her representative in the application process, knew the state of the law such that her work would be considered published.[25]

With respect to the Court's finding that Plaintiff's work was published when it was made available on YouTube, Instagram, and Twitter, the Court is similarly satisfied that Plaintiff was aware that such availability constituted publication under the Copyright Act. Plaintiff first sought registration for Plaintiff's work as a published work. (Doc. No. 116-7 at 20). Indeed, the application that was submitted to the Copyright Office lists the date of the first publication of Plaintiff's work as June 5, 2017—the same day that a YouTube video featuring Plaintiff and the WHC choir singing Way Maker with Plaintiff's work included was posted. (*Id.*; Doc. No. 115 at 10). In correspondence with the Copyright Office in the course of applying for the registration, the Copyright Office wrote to Adam Carpenter, of Plaintiff's then-music publisher, "Can you please explain how this work (and specifically how this version) was published? *A preliminary internet search of this work shows multiple published versions and live recordings that appear to be more complete*." (Doc. No. 116-7 at 14) (emphasis added). The email then provides a definition of "publication" as contained in the Compendium. (*Id.*). Engelhardt then reached out to the Copyright Office and changed the registration to be based on an unpublished work. (*Id.* at 16).

<hr>

[25] Although the Court acknowledges that the applicant in this case is Plaintiff and not Engelhardt, Plaintiff apparently permitted Engelhardt to act on her behalf in the application process and in determining to represent the work as unpublished, and therefore the Court is satisfied that it is Engelhardt's knowledge of the law that is relevant under *Unicolor* in this case.

This series of events tends to reflect that Plaintiff (and the Copyright Office for that matter) was under the impression that Plaintiff's work was already published, no doubt at least partially based on the availability of the work via YouTube, Instagram, and Twitter. The Court acknowledges that Plaintiff's attorney, Engelhardt, changed his mind when the Copyright Office sent him the definition of publication (a definition the Court reasonably assumes he or those applying for the registration must have already contemplated at some point prior to the correspondence), but this change of heart does not negate Plaintiff's prior knowledge that the work was previously published.[26]

Plaintiff's assertion that a clerical error or innocent mistake cannot show knowledge of the facts or law under § 411 because it does not demonstrate an intent to defraud is not persuasive. (Doc. No. 134 at 16). As discussed, the Court in *Unicolors* rejected the notion that the "knowledge" requirement under § 411 necessitates a finding of anything more than subjective awareness. *See Unicolors*, 142 S. Ct. at 947. To the extent that other courts have previously held that a showing of fraud is necessary, *Unicolors* has since contradicted those holdings. Therefore, Plaintiff's apparent suggestion that a showing of intent to defraud is necessary is without merit.[27] And even a clerical error or innocent mistake can be sufficient to meet the standard of subjective knowledge that inaccurate information was contained in the application, even if it was done negligently.

---

[26] Because the factual record reflects that Plaintiff was aware that Plaintiff's work was previously published based on the availability of the work on the Internet for the purposes of the "knowledge" requirement under § 411, the Court need not determine whether Plaintiff can rely on the argument that the law was unsettled so as prevent Defendants from demonstrating Plaintiff's knowledge.

[27] Plaintiff's argument appears to submit that in fact a mistake *was* made, and that Plaintiff's work was in fact published, with which the Court of course agrees. (Doc. No. 134 at 15–16). Though Plaintiff does not directly address that her argument necessitates the fact of this concession, it is evident that Plaintiff's argument is predicated on the idea that a mistake did in fact occur.

The factual record also contradicts the notion that Plaintiff's submission of her application as unpublished was a mere clerical error, regardless of whether a mere clerical error serves to negate a basis for an intent to defraud (as raised by Plaintiff). Plaintiff first sought the registration for Plaintiff's work as a published work. (Doc. No. 116-7 at 20). It was only after the Copyright Office asked for specifics regarding the prior publication on the belief that the versions available via an "internet search" showed "multiple published versions," that Plaintiff, acting through Engelhardt, changed the application to an application for an unpublished work. (*Id.* at 14). These events do not indicate that representing Plaintiff's work as unpublished was a mere clerical error. The decision to do so was obviously spurred by the communication with the Copyright Office after the Copyright Office thought that the work was *published* based *on the several versions of the work accessible on the internet.* Plaintiff's assertion that representing Plaintiff's work as unpublished was a clerical error therefore rings hollow.

To summarize, the Court finds that Plaintiff had knowledge of the facts, which Plaintiff does not dispute, and the law as required under *Unicolors*, of the inaccurate information contained on the application for the copyright registration.

## 4.  WHETHER THE REGISTER OF COPYRIGHTS WOULD HAVE REFUSED REGISTRATION

The parties dispute whether the inaccurate information that Plaintiff's work was previously published would have caused the Register of Copyrights to refuse registration. Defendants assert that inaccurately identifying a work as unpublished when it was in fact published is a "fundamental registration error," (Doc. No. 115 at 18) whereas Plaintiff asserts that the issue would have caused

the Office of the Copyright merely to "annotate or amend" the application to show that the work was previously published (Doc. No. 134).

The Court notes that there remains a question, which is unaddressed by the parties, as to whether a party requesting issuance to the Register of Copyrights must demonstrate that if the inaccurate information had been known, that the Register of Copyrights would have refused the registration. *See* 17 U.S.C. § 411(b)(1)(B). Indeed, the statute states that a certificate of registration satisfies the requirements of the section (*i.e.*, is valid) regardless of whether the certificate contains any inaccurate information unless: "(A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate" and "(B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration."[28] *See id.*

The statute then states that "[i]n any case in which inaccurate information described under paragraph (1) is alleged, the court shall request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration." *See id.* § 411(b)(2). It would be odd if the court, before issuing a request to the Register were to require demonstration of the very fact that the request itself is intended to either to confirm or deny—*i.e.*, that the inaccurate information, if known, would have caused the Register to refuse registration. It seems nonsensical to require the court, before asking a third party

---

[28] The Court notes that § 411 suggests that the inaccurate information at issue must be included in both the certificate of registration and the application for copyright registration. To the extent that the statute indeed requires such, it appears that neither side disputes that the alleged inaccuracy is included in the certificate in addition to application. And it is notable that the certificate of registration for Plaintiff's work (Doc. No. 116-7) does not reflect a publication date, which would tend to indicate that the work was represented to the Copyright Office as unpublished (especially given the heading "Completion/Publication" that can be included on a certificate where appropriate). In other words, given the ability to supply a publication date on the certificate of registration and the absence of such date on the certificate for Plaintiff's work, it appears that the inaccuracy regarding the publication status of Plaintiff's work is indeed included on the certificate for Plaintiff's work.

whether something is true, to make a finding that it is true. Other courts appear to have taken note of this oddity. True, some courts have found that a litigant requesting issuance under § 411 must show that "(1) that inaccurate information was included on an application for copyright registration with knowledge that it was inaccurate" *and* "(2) that the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration." *See Schenck*, 105 F. Supp. 3d at 817–818; *Olem Shoe Corp. v. Washington Shoe Co.*, 09-23494-Civ, 2010 WL 3505100, at *2 (S.D. Fla. Sept. 3 2010). However, other courts have found that a litigant is required to demonstrate that "(1) the registration application included inaccurate information; and (2) the registrant knowingly included the inaccuracy in his submission to the Copyright Office." *See King-Devick Test Inc. v. NYU Langone Hospitals*, 17-cv-9307, 2019 WL 3071935, at *7 (S.D.N.Y. Jul. 15, 2019); *Ty Inc. v. Target Corp.*, 18-cv-02354, 2022 WL 4367181, at *3 (N.D. Ill. Sept. 21, 2022). Therefore, some courts do not require a party requesting issuance under § 411 to show that the Register of Copyrights would have refused the registration had it known of the inaccurate information.

On the one hand, perhaps a court should make a materiality finding (*i.e.* a finding as to whether the Register of Copyrights would have issued the registration) before issuing questions to the Register as a matter of efficiency. Indeed, there may be some cases in which a non-material clerical error would rather obviously not result in denial of a registration, and a court's determination of such could preserve resources by avoiding issuance to the Register. Yet, it would appear that in many more cases, courts would be required to interpret the Copyright Office's practices to determine whether the inaccurate information would have caused the Register to refuse registration. And courts have routinely noted that where issues "seem[] to implicate interpretation or understanding of the Copyright Office's registration practices, the court could refer [] [the] issue

to the Register." *See e.g.*, *Schenck*, 105 F. Supp. 3d at 820; *Ronaldo Designer Jewelry, Inc. v. Cox*, 1-17-cv-2, 2019 WL 1795935, at *4 (N.D. Miss. Apr. 24, 2019). Though both outcomes have certain shortcomings, the Court finds that *not* requiring Defendants to demonstrate that the Register of Copyrights would have refused registration had it known of the inaccurate information is more consistent with § 411 and the way in which courts have interpreted § 411.

Ultimately, however, it is not necessary for the Court to determine whether a party requesting issuance under § 411 must demonstrate that had the Register of Copyrights known of the inaccurate information, that the Register would not have issued the registration. The Court finds that if Defendants in this case are required to make such a showing, that they have in fact done so.[29] As noted in *Palmer/Kane* and pointed out by Defendants, "wrongly identifying published works as unpublished has been deemed a 'fundamental registration error' requiring invalidation of a copyright registration." *See Palmer/Kane*, 188 F. Supp. 3d 347, 352 (S.D.N.Y. 2016) (quoting *Family Dollar Stores, Inc. v. United Fabrics Int', Inc.*, 896 F. Supp. 2d 223, 230 (S.D.N.Y. 2012)).[30] Though Plaintiff would have the Court step into the shoes of the Register of Copyrights by assessing the practices of the Copyright Office as to unpublished and published applications for copyright (Doc. No. 134 at 14–15), the Court declines to do so, as it views this to be part and parcel of the exact purpose of the Court to be advised by the Register on this issue

---

[29] One might reasonably ask the Court why, if it is confident (at least for now) that the Register would not have issued the registration had the Register known of the application's inaccurate information, it would bother even to ask the Register what the Register would have done. The answer is simple: the statute *requires* the Court to ask, once it finds that the requirements under § 411(b)(1) are met. And so the Court will ask here—with a full understanding that its preliminary view of what the Register would have done may be disproven by the Register's reliable statement on that issue.

[30] Plaintiff argues that the Court should not rely on *Palmer/Kane* for this proposition because *Palmer/Kane* in turn relies on *Family Dollar*, which has been treated with disfavor by several other courts. (Doc. No. 134 at 15). As Defendants correctly point out, the aspect of *Family Dollar* with which other courts have disagreed is distinct from the issue of whether publication is a fundamental registration error that can serve as a basis for invalidating a copyright. Therefore, *Palmer/Kane* and its reliance on *Family Dollar* is not inconsistent with how other courts have treated *Family Dollar*.

under § 411(b)(2). It is sufficient under § 411(b)(1) for the Court to find that misrepresenting a work as unpublished when it was in fact published is a "fundamental registration error" that courts have recognized as a basis to warrant invalidating a copyright registration.

Therefore, while there remains much confusion as to whether a party requesting issuance under § 411 must demonstrate that the Register would not have issued the registration had the Register known of the inaccurate information, the Court finds that Defendants have met this burden in this case.

<u>CONCLUSION</u>

In summary, the Court finds that Defendants have met their burden under 17 U.S.C. § 411 such that the Court must request the Register of Copyrights to advise the Court whether the inaccurate information discussed herein, if known to the Register of Copyrights, would have caused the Register of Copyrights to refuse registration. Therefore, for the reasons (and to the extent) stated herein, Defendants' Motion at Doc. No. 114 will be GRANTED in part and DENIED in part. Moreover, the motions at Doc. Nos. 111 and 118 will be DENIED without prejudice subject to the filing of them again (perhaps in updated form) after receipt of the response from the Register.

An appropriate order will be entered.

_Eli Richardson_

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE